JS 6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Arlander Keys | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 2819 | **DATE** | 3/28/2000 |
| **CASE TITLE** | Joseph A. Zurawski vs. Kenneth S. Apfel | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's Motion for Summary Judgment (24-1) is granted. Plaintiff's Motion for Summary Judgment (19-1) is denied. The Court finds that the Commissioner's conclusion that Plaintiff was not disabled is supported by substantial evidence in the record as a whole.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | 2 | | **Document Number** |
| ✓ | Notices mailed by judge's staff. | | number of notices | | |
| | Notified counsel by telephone. | | MAR 29 2000 | | |
| | Docketing to mail notices. | | date docketed | | 27 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | 3/28/2000 | | |
| VKD | courtroom deputy's initials | | date mailed notice | | |
| | | | VKD | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

Joseph A. Zurawski,                )
                                   )
        Plaintiff,                 )        No. 99 C 2819
                                   )
        v.                         )
                                   )        Magistrate Judge
Kenneth S. Apfel,                  )        Arlander Keys
Commissioner of the Social         )
Security Administration,           )
                                   )        DOCKETED
        Defendant.                 )
                                            MAR 2 9 2000

## MEMORANDUM OPINION AND ORDER

The Plaintiff, Joseph A. Zurawski, pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), moves this Court for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure reversing the decision of the Commissioner of Social Security ("Commissioner") which found that he was not entitled to Disability Insurance Benefits and Supplemental Security Income, or, in the alternative, an order remanding the case to the Commissioner for further proceedings. The Commissioner has filed a cross-motion for summary judgment in his favor. For the reasons set forth below, the Court grants Defendant's Motion for Summary Judgment and denies Plaintiff's Motion for Summary Judgment.

## PROCEDURAL HISTORY

Plaintiff applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on October 13, 1995, alleging that he became disabled on December 5, 1993. (R. at 33-39.)[1] Plaintiff alleged disability due to lower back pain, neck pain, loss of strength in his legs, arm and shoulder pain, and depression. (R. at 41.) Plaintiff's applications were denied on December 12, 1995 (R. at 41-48), and, pursuant to Plaintiff's Request for Reconsideration (R. at 49), the applications were again denied on March 20, 1996. (R. at 51-53.)

On April 12, 1996, Plaintiff filed a Request for Hearing by Administrative Law Judge, (R. at 57), pursuant to which a hearing was held before Administrative Law Judge ("ALJ") Christine Holtz on May 29, 1997. (R. at 447-504.) On November 19, 1997, the ALJ issued a decision, finding that Plaintiff was not disabled and could perform a full range of light work. (R. at 15-22.) On April 30, 1998, Plaintiff filed a Request for Review of Hearing by the Appeals Council. (R. at 10.) On March 5, 1999, the Appeals Council denied review, (R. at 5-6), which stands as the Commissioner's final decision. (R. at 5.)

---

[1] Mr. Zurawski previously applied for DIB and SSI in August 1994, which was denied. (R. at 394-98.) In the current case, the ALJ found that it was not necessary to consider whether this prior claim should be reopened and revised since Mr. Zurawski was not disabled. (R. at 16.)

## FACTUAL BACKGROUND

### A. Plaintiff's Prior Condition

At the time of the hearing, Plaintiff was thirty nine years old. (R. at 16.) He was married and had four children ages eight through seventeen. (R. at 453.) He is a high school graduate. (R. at 72, 447.)

Plaintiff worked from 1975 through 1993. (R. at 88.) From January 1988 until December 1993, he worked for his brother's company, Zur Flooring. (R. at 88, 456.) Zur Flooring was a small company which installed flooring and performed remodeling work for commercial and residential customers. (R. at 456.) His work involved office work, as well as removal and installation of flooring. (R. at 456.) The removal and installation required Plaintiff to lift weights from 50 to 100 pounds, walk for three hours, stand for three hours, and sit for three hours with constant bending. (R. at 459.) Further, Plaintiff was required to operate floor grinders, concrete mixers, and bobcats. (R. at 459.) Before working at Zur Flooring, Plaintiff was self-employed from 1978 or 1979 until 1988. (R. at 458.) This job involved frequent lifting over 50 pounds with constant walking and standing. (R. at 461-62.) Further, Plaintiff worked at a cabinet shop named Tri-Star Cabinets. (R. at 458.)

On December 3, 1993, Plaintiff stopped working when he injured his back on the job. (R. at 498-99.) At the time of Plaintiff's

hearing, he had a worker's compensation case pending.  (R. at 462.)

## B.  Physical Evidence

In November 1993, Plaintiff sought treatment with Dr. Darren Deskin, a chiropractor.  (R. at 392-93.)  Dr. Deskin noted that Plaintiff had a fifteen year history of chronic low back pain, which had worsened in October 1993.  (R. at 390.)  In his initial report, Dr. Deskin stated that Plaintiff had pain upon palpation of the L4 and L5, and there was evidence of degeneration of the L5 disc.  (R. at 393.)  Dr. Deskin indicated that these symptoms were consistent with "someone that has had a long history of repetitive movements."  (R. at 393.)  Dr. Deskin treated Zuwarski with intersegmental traction, axial traction, and spinal manipulation. (R. at 392.)  According to Dr. Deskin, "Mr. Zurawski is responding slow to care."  (R. at 392.)

On March 3, 1994, Dr. Deskin treated Plaintiff again.  (R. at 391.)  In his report, Plaintiff stated he was 60% improved.  (R. at 391.)  Dr. Deskin opined that Plaintiff would be able to return to work in March 1994.  (R. at 391.)  Plaintiff saw Dr. Deskin again on March 15, 1994.  Plaintiff still had back pain, but was able to control it 70-80% of the time.  (R. at 390.)  Further, Dr. Deskin noted that Plaintiff was able to work in his shop most of the day without pain.  (R. at 390.)

In March 1994, Plaintiff sought a second opinion from Dr. Robert Semba, who examined him on March 16, 1994.  (R. at 384-85,

388.)  Dr. Semba agreed with Dr. Deskin that Plaintiff had some
arthrosis at his L5/S1 area.  (R. at 388.)  Dr. Semba examined
X-rays and performed various tests, all of which were normal.  (R.
at 388.)  However, he stated that Plaintiff was capable of limited
duty where he could take periodic breaks when he could stretch his
back.  (R. at 388.)

On April 15, 1994, Dr. Deskin examined Plaintiff again.  (R.
at 386-87.)  Plaintiff reported that he was able to go most of the
week with only experiencing an ache in his low back and would
experience sharp pain perhaps twice per month.  (R. at 387.)  In
Dr. Deskin's opinion, Plaintiff was able to go back to full duties
on April 18, 1994.  (R. at 380.)

In September 1994, Dr. David Spencer examined Plaintiff.  (R.
at 439-40.)  Dr. Spencer noted that although Dr. Deskin had
recommended a release to full duty on April 18, 1994, Plaintiff
"never did return to normal duty and has continued to have
subjective complaints of pain with no objective evidence of any
lumbar spine derangement."  (R. at 439.)  Dr. Spencer found that
Plaintiff had a "prolonged period of unemployment since 11/9/93
with scanty evidence of any lumbar spine disfunction [sic]."  (R.
at 440.)  Dr. Spencer stated that Plaintiff was physically capable
of returning to work as a tile setter.  (R. at 440.)  According to
Dr. Spencer, Plaintiff had "an unnecessarily long period of
chiropractic treatments out of proportion to any recognized back

abnormality." (R. at 440.)

Plaintiff did not receive treatment again until June 1995, with Dr. Marwaha. (R. at 465-66.) Dr. Marwaha prescribed anti-inflammatory medication and muscle relaxants. (R. at 466.) Dr. Marwaha referred Plaintiff to Dr. Vikram Gandhi. (R. at 466.)

In June 1995, Dr. Gandhi examined Plaintiff. (R. at 405.) Dr. Gandhi found good range of motion, satisfactory deep tendon reflexes, and diminished straight leg raising with thigh hamstrings. (R. at 405.) Dr. Gandhi stated that the lumbar spine itself did not explain all of Zurawski's symptoms. (R. at 405.) Plaintiff underwent physical therapy from July 1995 through November 1995, three times per week. (R. at 143-44, 263-64, 267-81.)

In October 1995, a magnetic resonance imaging (MRI) of Plaintiff's lumbar and cervical spine indicated a bulging disc at C5/6, abnormal signal within the cervical cord at the C7 and T1 levels, and degenerative disc disease at L5/S1, with marginal spurring of the end plates of the vertebral bodies. (R. at 131-32.)

In November 1995, Dr. Gandhi examined Plaintiff. (R. at 140-41.) Dr. Gandhi stated that Plaintiff's abilities to lift and carry were affected, but that he was able to walk unassisted. (R. at 141.) Dr. Gandhi referred Plaintiff to Dr. Ramsis Ghaly (R. at 325.)

In November 1995, Dr. Ghaly examined Plaintiff. (R. at 325-26.) Plaintiff stated that, when he bent his neck, he would feel a sharp pain in his right heel. (R. at 325.) Plaintiff claimed that the pain in his lower back sometimes went to his thigh and hips. (R. at 325.) It was Dr. Ghaly's impression that Plaintiff had diffuse and low back pain, with imaging studies demonstrating a small bulging disc at C5-6, and foraminal stenosis in the lumbar region. (R. at 325-26.)

In January 1996, an MRI was taken of Plaintiff's thoracic spine. (R. at 260-61.) The MRI indicated that Plaintiff's thoracic spine was normal. (R. at 260.) An MRI was also taken of Plaintiff's cervical spine. (R. at 341.) This MRI revealed slight cervical straightening, with some apparent degenerative bony change at the C5-6. (R. at 341.) A computerized tomography (CT) scan of Plaintiff's lumbar spine indicated minimal disc bulging and arthritic changes. (R. at 249.)

In January 1996, Dr. Ghaly again examined Plaintiff. (R. at 327-28.) Dr. Ghaly found some pulling in Plaintiff's right leg with the leg raising test around 30 to 40 degrees. (R. at 327.) Further, Dr. Ghaly found that "sensation is inconsistent and does not make any sense in different regions in the left arm and the left leg compared to the right side." (R. at 327.) Dr. Ghaly recommended physical therapy. (R. at 328.) Plaintiff engaged in physical therapy until March 1996. (R. at 239-41.)

7

In January 1996, Dr. Gorski performed a epidural steroid injection on Plaintiff. (R. at 255-56.) Plaintiff complained of low and upper back pain, with some numbness noted in the right foot and heel. (R. at 256.) Plaintiff claimed that standing, sitting, and bending made the pain worse. (R. at 256.) Dr. Gorski administered another epidural steroid injection in February 1996. (R. at 250.) Plaintiff claimed that he had experienced some pain relief from the first steroid injection, but the overall improvement was not significant. (R. at 250.) Dr. Gorski performed a third steroid injection in March 1996. (R. at 232.) Before this injection, Plaintiff stated that he experienced temporary relief after the two previous injections; however, the pain returned to pre-injection levels. (R. at 232.)

In February 1996, Plaintiff underwent a lumbar myelogram, which was reported as normal. (R. at 248.) Dr. Ghaly indicated that Plaintiff had a normal lumbar myelogram except for the bulging disc at L5-S1. (R. at 330.) Dr. Ghaly noted, "putting all the x-rays together, there is no good explanation for his subjective pain." (R. at 330.) Dr. Ghaly noted that Plaintiff was to see Dr. Lee, a psychiatrist, for other suggestions of how to take care of the back pain. (R. at 330.) Dr. Ghaly released Plaintiff to perform light duty. (R. at 330.)

In April 1996, Plaintiff was admitted to Columbus Cabrini Hospital for inpatient back treatment. (R. at 155.) Dr. Ghaly

diagnosed Plaintiff with cervical radiculopathy and administered steroid injections. (R. at 155-56.) Plaintiff was sent to physical therapy, occupational therapy, and back school. (R. at 155-56.) Plaintiff's pain slowly decreased. (R. at 156.) Upon discharge from the hospital on April 5, 1996, Dr. Fischer opined that Plaintiff could lift up to 10 pounds. (R. at 156.)

From April 1996, through May 1996, Plaintiff attended physical therapy. (R. at 335-337.) Plaintiff still complained of occasional back pain, with intermittent symptoms in his right heel. (R. at 337.) The physical therapist discharged Plaintiff in May 1996 because Plaintiff had received "maximum benefits from physical therapy at this time." (R. at 337.) Upon discharge, Dr. Ghaly stated that Plaintiff was going to a functional capacity evaluation and advised him that he should return to work. (R. at 407.) In June 1996, Plaintiff sought further treatment at the St. Joseph Center. (R. at 309-312.) The diagnosis was chronic low back pain. (R. at 309-312.)

In June 1996, ERGOS, a work recovery program, evaluated Plaintiff. (R. at 315-324.) The evaluator, Susan Brookins, M.S., P.T., OTR/L, stated that Plaintiff performed at a medium exertional level. (R. at 316-17.) Further, Plaintiff showed the potential for performing in the Medium/Heavy physical demand. (R. at 317.) Plaintiff complained of increased pain in the afternoon and right-sided pain throughout the evaluation. (R. at 317.) Further, Ms.

Brookins noted that Plaintiff's abilities to sit, stand, walk, stoop, kneel, crouch, crawl, reach, and handle were unrestricted. (R. at 322-23.)

In September 1996, Dr. Ronald Lotesto, a psychiatrist (R. at 424), treated Plaintiff. (R. at 380.) Dr. Lotesto indicated that he had been treating Plaintiff for chronic pain conditions. (R. at 380.) Dr. Lotesto stated that Plaintiff had disc herniations, which were severe to the point where he was unable to function. (R. at 380.)

In November 1996, Dr. Ghaly examined Plaintiff. (R. at 408.) Dr. Ghaly noted that Plaintiff was trying to look for work, but that he was having a hard time finding the appropriate job. (R. at 408.) Dr. Ghaly further noted that Plaintiff was losing weight and that he was happy taking care of the kids at home. (R. at 408.)

In December 1996, Dr. Lotesto noted that Plaintiff reported pain relief with medication, but that he had some shooting pain in his right leg. (R. at 419.)

In February 1997, Dr. Lotesto, the psychiatrist, met with Plaintiff. (R. at 418.) Dr. Lotesto noted that Plaintiff was doing well. (R. at 418.) In April 1997, Dr. Lotesto noted that Plaintiff had pain relief with medication. (R. at 417.)

## C. Mental Evidence

In July 1995, Plaintiff visited the Will County Health Department. (R. at 120-30.) Susan Jungers, M.S/M.H.C. diagnosed

Plaintiff with an adjustment disorder with depressed mood and assessed his Global Assessment of Functioning ("GAF") at seventy, indicating mild symptoms. (R. at 128.) Ms. Jungers noted that Plaintiff had severe social and environmental stressors. (R. at 128.) In August 1995, Dr. Lozano, a psychiatrist, confirmed Ms. Junger's diagnosis. (R. at 118-19.) Plaintiff began monthly treatment with Ms. Jungers and Dr. Lozano. (R. at 353-61.) In February 1996, Dr. Lozano again diagnosed Plaintiff with adjustment disorder with depressed mood and again assessed Plaintiff's GAF at seventy. (R. at 358.) From June through November 1996, Plaintiff attended group therapy sessions on a semi-monthly basis. (R. at 410-414.) Plaintiff continued seeing Ms. Jungers monthly from November 1996 through May 1997. (R. at 409-410.)

In November 1995, State reviewing psychologists found that Plaintiff had a non-severe adjustment disorder, with slight limitations on his activities of daily living and ability to maintain social functioning, no deficiencies in concentration, persistence, or pace, and no decompensation at the workplace. (R. at 109-17.)

**D. Plaintiff's Testimony**

On May 29, 1997, Plaintiff testified before the ALJ. (R. at 447-504.) Plaintiff testified that he was insured under the State of Illinois' MediPlan. (R. at 454.) Plaintiff stated that he had worked with Zur Flooring, JAZ Installation (self-employed), and

Tri-Star Cabinets. (R. at 456-58.) Plaintiff's work duties entailed lifting the heaviest weight of 100 pounds, most frequently lifted around 50 pounds, three hours of walking, three hours of standing, and three hours of sitting, with constant bending. (R. at 459.)

Plaintiff testified that he had to discontinue treatment with Dr. Deskin partly because he was not being paid by worker's compensation, and party because Dr. Deskin "started playing psychologist with me." (R. at 464.) According to Plaintiff, Dr. Deskin said "I can sit you down in a half-hour and straighten your mind out, because a lot of it is in your mind right now." (R. at 464.)

Plaintiff responded to questions concerning Dr. Ghaly's examinations. (R. at 469-70.) Plaintiff claimed that he "was trying to look for work, just -- nobody, nobody that knew me with my back problems wanted to touch me, plus there was a problem with, I could not control the pain." (R. at 469.) Further, Plaintiff indicated his trouble with finding work: "No, no. I wasn't happy being at home, you know. I love my kids and I take care of them, you know, but what am I supposed to do?" (R. at 470.) Plaintiff testified that he felt better when he began to see Dr. Lotesto, who changed his medications. (R. at 470.) Dr. Lotesto prescribed Tegretol, which satisfied Plaintiff's pain problems. (R. at 471.)

Plaintiff testified that the epidural steroid injections did

little to stop his back pain. (R. at 473.) Plaintiff also testified that he started to limp on his right leg again after he was examined at ERGOS. (R. at 475.) At the time of the hearing, Plaintiff was taking Tegretol, Serzone, Ultram, Amitriptyline (for sleeping), and Zantac (for his stomach ulcers and unstable stomach.) (R. at 478.) Further, Plaintiff took Valium only on "bad days." (R. at 479-80.)

Plaintiff testified that he did not know that Dr. Lotesto was solely a psychiatrist. (R. at 481.) Rather, Plaintiff thought that Dr. Lotesto was a "doctor that specialized in using pain medicine." (R. at 481.) Plaintiff testified that he never talked about psychological problems with Dr. Lotesto, but only discussed his back pain. (R. at 482.)

Plaintiff testified about his average day. (R. at 489-96.) At around 6:30 or 7:00, Plaintiff woke up to drive his children to school. (R. at 489.) Plaintiff then usually "[got] things done around the house, a few things like the dishes or that, I do it. If not, I'll go back to bed for another hour or so." (R. at 491.) Plaintiff then usually prepared himself breakfast and took his medication. (R. at 491.) Further, Plaintiff would "wash the dishes, pick up after the children, do laundry." (R. at 491.) Then Plaintiff would begin to prepare dinner. (R. at 492.) Plaintiff would also drive and pick up the children from school and help them with their homework. (R. at 492.) Plaintiff testified

that his wife was also home due to an injury. (R. at 494.) After
dinner, Plaintiff washed and dried the dishes. (R. at 495.) After
the day's events, Plaintiff usually got off his feet and was in
pain. (R. at 495.)

**E. ALJ's Decision**

In her November 19, 1997 decision, the ALJ found that the
medical evidence established that the Plaintiff had a disorder of
the back and depression. (R. at 21.) The ALJ held, however, that
the impairments were severe, but that they did not meet or equal
the criteria of any of the impairments listed in Appendix 1,
Subpart P, Regulations No. 4. (R. at 21.) The ALJ found that
Plaintiff was unable to return to his past work as a laborer,
mechanic, and carpenter. (R. at 21.) The ALJ found that, based
upon an exertional capacity for light work, plaintiff's age,
educational background, work experience, and using as a frame of
reference Sections 404.1569 and 416.969 and Rule 202.20, Table 2,
Appendix 2, Subpart P, Regulations No. 4, Plaintiff was capable of
making an adjustment to work which exists in significant numbers in
the national economy. (R. at 21.) She noted that the Plaintiff
lacked the residual functional capacity to lift and carry more than
20 to 25 pounds on a regular basis. (R. at 21.) Further, the ALJ
ruled that Plaintiff's statements about his impairments and their
impact on his ability to work were not entirely credible. (R. at
21.) The ALJ ruled that Plaintiff had an adjustment disorder with

14

a depressed mood; thus, meeting the "A" criteria of Listing 12.04. (R. at 17.) However, the ALJ found that Plaintiff did not demonstrate a functional limitation to satisfy the "B" criteria of Listing 12.04; therefore, his mental impairment was not disabling under 20 C.F.R. § 416.920(d) and 416.610. (R. at 18.) Additionally, the ALJ found that Plaintiff had only "slight" limitations in regard to his activities of daily living. (R. at 17.) The ALJ concluded that, since the claimant was capable of making an adjustment to other work, he was not disabled within the meaning of the Social Security Act, and consequently, was not entitled to receive DIB or SSI payments. (R. at 20.)

## STANDARD OF REVIEW

In reviewing the Commissioner's (here the ALJ's) decision, the court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Rather, the court must accept findings of fact that are supported by "substantial evidence," 42 U.S.C. § 405(g), where substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron,* 19 F.3d at 333 (quoting *Richardson v. Perales*, 402 U.S. 389 (1971)). The ALJ must consider all relevant evidence and may not select and discuss only that evidence that favors her ultimate conclusion. *Herron*, 19 F.3d at 333. Where conflicting evidence allows reasonable minds to differ, the

responsibility for determining whether a claimant is disabled falls upon the Commissioner (or ALJ), not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990); *see also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which she finds more credible). Where there is a conflict between medical opinions, the ALJ may choose between those opinions but may not substitute her own lay opinion for that of the medical professionals. *Davis v. Chater*, 952 F. Supp. 561, 566 (N.D. Ill. 1996). This Court is limited to determining whether the Commissioner's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v. Secretary of Health and Human Services*, 969 F.2d 534, 538 (7th Cir. 1992).

This does not mean that the Commissioner (or ALJ) is entitled to unlimited judicial deference, however. In addition to relying on substantial evidence, the ALJ must articulate her analysis at some minimal level and state her reasons for accepting or rejecting "entire lines of evidence," although she need not evaluate in writing every piece of evidence in the record. *See Herron*, 19 F.3d at 333; *see also Young v. Secretary of Health and Human Services*, 957 F.2d 386, 393 (7th Cir. 1992) (ALJ must articulate her reason for rejecting evidence "within reasonable limits" in order for meaningful appellate review); *Guercio v. Shalala*, 1994 U.S. Dist. LEXIS 2526, No. 93 C 323, 1994 WL 66102, *9 (N.D. Ill. 1994) (ALJ

need not spell out every step in her reasoning, provided she has given sufficient direction that the full course of her decision may be discerned) (citing *Brown v. Bowen*, 847 F.2d 342, 346 (7th Cir. 1988)).

The Social Security regulations prescribe a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520 and 416.920 (1999). The ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520 and 416.920 (1999); *see also Young*, 957 F.2d 386, 389. A finding of disability requires an affirmative answer at either step 3 or step 5. A negative answer at any step (other than step 3) precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1-4, after which the burden shifts to the Commissioner at step 5. *Id.*

## DISCUSSION

Plaintiff contends that the ALJ's decision is not supported by substantial evidence because she failed to consider the record as

a whole in determining that Plaintiff was able to perform a full range of light work. (Pl.'s Mot. for Summ. J. at 13.) Also, Plaintiff contends that the ALJ erred in finding that Plaintiff's subjective complaints of his impairments were not credible. (Pl.'s Mot. for Summ. J. at 13-14.) Further, Plaintiff contends that the Commissioner erred in determining that Plaintiff's depression was not severe. (Pl.'s Mot. for Summ. J. at 14-15.)

In this case, the ALJ found in Plaintiff's favor at step one; however, she noted that Plaintiff was able to work in his garage, which was converted into a shop to "maintain the trucks, for staining and trimming cabinets, for repairing vacuum cleaners and bicycles." (R. at 16.) The ALJ also found in the Plaintiff's favor at step two, that the Plaintiff's impairments were severe. (R. at 21.) At step three, the ALJ found that the Plaintiff's impairments did not meet or equal the criteria of any of the impairments listed in the regulations as being so severe as to preclude substantial, gainful activities. (R. at 21.) At step four, the ALJ found that the Plaintiff's past work involved heavy lifting of up to 100 pounds. (R. at 20.) Since Plaintiff could not lift heavy objects, the ALJ ruled that Plaintiff could not return to his previous work. (R. at 20.)

At step five, the burden shifted to the ALJ to prove that the claimant is able to perform other work existing in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520 and

416.920 (1999). The ALJ must evaluate the claimant's Residual Functional Capacity ("RFC") to perform a particular category of work (i.e. sedentary, light, medium, heavy, or very heavy work), in combination with an application of the Medical-Vocational Guidelines ("the Grid") to determine whether an individual of the claimant's age, education, and work experience could engage in substantial gainful activity. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2 (1999). If use of the Grid is appropriate, the Commissioner may rely upon it for determining disability. *See Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). In such a case, the Grid alone suffices as substantial evidence to uphold the decision of the Commissioner. *Id.* However, use of the Grid is inappropriate if the claimant suffers from severe non-exertional impairments which prevent the claimant from performing the work indicated by the Grid. *Id.* at 640-41. Thus, if non-exertional impairments are severe enough, use of the Grid is not appropriate and the courts will reverse a determination of non-disability based on the Grid. *Id.* at 641.

The determination as to whether use of the Grid is appropriate is a question of fact, and the ALJ's use of the Grid will be upheld if substantial evidence supports its application. *Walker*, 834 F.2d at 641. The fact that a claimant suffers from a non-exertional impairment does not automatically preclude utilization of the Grid. In such a case, the ALJ must evaluate whether the claimant's

non-exertional impairments are severe enough to substantially limit the claimant's abilities. *Id.* "To uphold the ALJ's finding that grids may be used in a given case, we require only 'that there be reliable evidence of some kind that would persuade a reasonable person that the limitations in question do not significantly diminish the employment opportunities otherwise available.'" *Id.* (quoting *Warmoth v. Bowen*, 798 F.2d 1109, 1112 (7th Cir. 1986)).

The Court, having carefully reviewed the entire record upon which the ALJ based her decision, concludes that her analysis of the medical records and credibility findings are supported by substantial evidence in the record as a whole.

## A. Substantial Evidence

Plaintiff asserts that the ALJ failed to consider the record as a whole in determining that Plaintiff could perform a full range of light duty;[2] thus, her decision is not supported by substantial evidence. (Pl.'s Mot. for Summ. J. at 13.) Plaintiff more specifically asserts that the ALJ erred in isolating certain

---

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b) (1999).

portions of the record and not considering the opinion of Dr. Lotesto and evidence of four epidural steroid injections, inpatient hospitalization for aggressive back therapy program, heavy medications, and physical therapy. (Pl.'s Reply Mem. at 6.); (Pl.'s Mot. for Summ. J. at 13.)

Although the ALJ did not specifically note these particular portions of the medical record in her decision, she sufficiently considered the record as a whole. While it is true that "an ALJ may not ignore an entire line of evidence that is contrary to her findings," *Henderson v. Apfel,* 179 F.3d 507, 514 (7th Cir. 1999), a written evaluation of each piece of evidence or testimony is not required. *See id., see also Diaz,* 55 F.3d 300, 307 (7th Cir. 1995). Nevertheless, the ALJ may not select only evidence that favors her ultimate decision. *See Herron,* 19 F.3d at 334 (citing *Orlando v. Heckler,* 776 F.2d 209, 213 (7th Cir. 1985). Further, the ALJ "must articulate at some minimal level his analysis of the evidence." *Ray v. Bowen,* 843 F.2d 998, 1002 (7th Cir. 1988).

The ALJ's decision that Plaintiff could perform a full range of light duty is supported by the objective medical findings of Dr. Semba (R. at 18), Dr. Deskin (R. at 19), Dr. Spencer (R. at 18-19), Dr. Ghaly (R. at 19), and the ERGOS functional capacity assessment (R. at 19.) As early as March 17, 1994, Dr. Semba noted that Plaintiff could perform some work. "It would be nice if he was in a situation where he could continue his line of work but

interspersed with periodic breaks when he could stretch his back and not [sic] so much pressure on that degenerative segment of the spine." (R. at 388.) Dr. Deskin opined that Plaintiff could return to full duty as of April 1994. (R. at 386-87.) In September 1994, Dr. Spencer found that Plaintiff could physically return to work as a tile setter and that he had an "unnecessarily long period of chiropractic treatments out of proportion to any recognized back abnormality." (R. at 440.) In February and March 1996, Dr. Ghaly opined that Plaintiff was able to return to light duty. (R. at 329, 330.) Further, the ERGOS work evaluation found that Plaintiff could perform the requirements of medium work and had no restrictions on his ability to stand, sit, or walk. (R. at 316-17, 322-23.) The fact that Plaintiff had steroid injections, physical therapy, and medications for his back condition does not negate expert medical opinions that Plaintiff was able to perform light duty. Further, Dr. Lotesto's opinion holds slight weight amongst the evidence used in the ALJ's decision. Dr. Lotesto's specialty is psychiatry. (R. at 424.) The Court notes that Dr. Lotesto, a psychiatrist, erroneously concluded that Plaintiff suffers from disc herniations. (R. at 380.) The objective findings on the myelogram and the CT scan -- as well as the opinions of the other treating physicians -- show that Plaintiff has a minimal bulging disc, with arthritic changes, not a herniation. Dr. Lotesto, like the steroid injections and physical therapy, merely treated

Plaintiff's pain. (R. at 380, 417-19.) The ALJ considered these secondary pieces of evidence; however, they were not weighty enough to effect the substantial evidence upon which the ALJ relied. The exclusion of these items of evidence does not undermine the substantial evidence that supports the ALJ's decision.

## B. Plaintiff's Credibility

In order for a claimant to prove he is disabled, there must be medical signs and clinical findings that show a medical impairment which could reasonably be expected to produce that pain or other symptoms alleged, and which, considered with all the other evidence, would lead to a conclusion of disability. 20 C.F.R. § 404.1529(c)(1) (1999). The ALJ is the proper authority to determine whether a claimant's subjective complaints of pain or other functional limitations are credible, or supported by the medical evidence. *Walker*, 834 F.2d at 641. The ALJ's credibility determinations will not be overturned unless they are "patently wrong in view of the cold record" before the court. *Pope v. Shalala*, 998 F.2d 473, 487 (7th Cir. 1993); *Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir. 1986), *cert. denied*, 479 U.S. 988 (1986). An ALJ may not disregard subjective complaints merely because they are not fully supported by objective medical evidence. *See Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995) (citing *Siemers v. Shalala*, 47 F.3d 299, 301 (8th Cir. 1995)). The absence of objective evidence is just one factor to be considered along with:

23

(a) claimant's daily activities; (b) the location, duration; frequency and intensity of the pain; (c) precipitating and aggravating factors; (d) type, dosage, effectiveness and side effects of medication; (e) treatment other than medication; (f) any measure the claimant has used to relieve the pain or other symptoms; and (g) functional limitations and restrictions. 20 C.F.R. § 404.1529(c)(3) (1999); *see also Knight*, 55 F.3d at 314.

Considering these factors, the ALJ did not err in determining that Plaintiff's subjective complaints were not entirely credible. The ALJ found Plaintiff's testimony concerning his symptoms and functional effects was "not credible due to the inconsistencies with the objective medical evidence, and inconsistencies with daily activities." (R. at 17.) Reviewing the objective medical findings, the evidence clearly supports the ALJ's finding. Dr. Spencer stated, "it is my opinion that this gentleman has had an excessively long period of unemployment with no evidence of any lumbar disfunction [sic] to substantiate his complaints of pain." (R. at 440.) Dr. Gandhi noted upon examination of Plaintiff, "[the] lumbar spine itself, does not seem to explain all of [Zurawski's] symptoms." (R. at 405.) Dr. Ghaly opined that, "putting all the x-rays together, there is no good explanation for his subjective pain." (R. at 330.) Dr. Deskin noted in March of 1994 that Plaintiff was "now . . . able to work in his shop most of the day without pain." (R. at 390.) Further, the Plaintiff's daily activities support the ALJ's holding. The ALJ found that

24

Plaintiff was able to work in his shop "to maintain trucks, for staining and trimming cabinets, and for repairing vacuum cleaners and bicycles," (R. at 16.), even though he had subjective complaints of pain. Also, the daily activities, which included helping the children to school, making breakfast, picking up after the children, doing laundry, preparing dinner, and helping the children with homework, were considered in finding Plaintiff's statements incredible. (R. at 17.) In light of this evidence, the ALJ's credibility finding was not patently wrong in view of the cold record, and accordingly will not be overturned.

## C. Mental Condition

The ALJ did not err when she determined that Plaintiff did not have a severe mental impairment. (R. at 18.)[3] The ALJ found that Plaintiff had an adjustment disorder with a depressed mood, thus meeting the "A" criteria of Listing 12.04 (20 C.F.R. § 404, Appendix 1, Subpart P, Regulations No. 4.); however, she found further that the record failed "to demonstrate the degree of functional limitations which satisfy the 'B' criteria of Listing

---

[3] Plaintiff further argues that the ALJ's findings inconsistently characterized Plaintiff's mental condition as not severe, (R. at 18), and severe (R. at 21.) Plaintiff misinterprets the ALJ's latter holding. The ALJ found that the "impairments which are severe," were the disorder of the back and the depression. (R. at 21.) The ALJ referred to the combination of impairments as severe in her analysis at step two, but at step three, she found that neither of the impairments met the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (R. at 21.) This is consistent with the ALJ's finding that the depression alone was not severe. (R. at 18, 20, 23-24.)

12.04." (R. at 18.) Accordingly, the ALJ found that the mental impairment was not severe under 20 C.F.R. § 416.920(d) and 416.610. (R. at 18.) Plaintiff argues that this finding was not supported by substantial evidence because the ALJ disregarded evidence of mental health treatment. (Pl.'s Mot. for Summ. J. at 14-15.) The ALJ considered the Will County Health Department's psychological evaluation. (R. at 17.) The evaluation found that Plaintiff was "somewhat irritable concerning his lack of a job, and current financial problems." (R. at 17.) Beyond this evidence, the evaluation generally found that Plaintiff "demonstrated appropriate behavior and attitude." (R. at 17.) Further, the ALJ considered testimony concerning Plaintiff's daily activities. (R. at 17.) After considering these pieces of evidence and the entire medical record, the ALJ found that Plaintiff "seldom" displayed deficiencies of concentration and "never" displayed episodes of deterioration or decompensation. (R. at 18.) The ALJ's decision is supported by the lack of severe psychological problems in the Will County Health Department's evaluation, (R. at 17), Ms. Junger's examination, (R. at 128.), Dr. Lozano's examination (R. at 118-19, 358.), and the State reviewing psychologists' examination. (R. at 109-17.) Since there was no indication of any mental problems beyond a slight limitation in regard to his activities of daily living, the ALJ did not err is ruling that Plaintiff's depression was not severe.

## CONCLUSION

Having carefully reviewed the entire record, and for the reasons set forth above, the Court finds that the Commissioner's conclusion that Plaintiff was not disabled is supported by substantial evidence in the record as a whole. Accordingly,

**IT IS HEREBY ORDERED** that the Commissioner's Motion for Summary Judgment be, and the same hereby is, **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment be, and the same hereby is, **DENIED.**

Dated: March 28, 2000        E N T E R:

_____
ARLANDER KEYS
United States Magistrate Judge